argument. We will turn to the next case this morning, which is Continental Materials v. Valco, and that's case 17-1108. I'm ready to hear you, Counsel. Good morning, and may it please the Court. My name is Michael Sink. With me today is Norton Cutler. Also with us in the courtroom are Mr. Tetzlaff and Mr. Binder. We represent the plaintiff below, Continental Materials. All right. On appeal, Continental requests this Court reverse the District Court's grant of partial summary judgment on six of its seven claims against Valco arising out of a 100-year sand and gravel lease and related acquisition agreement related to approximately 1,400 acres, or approximately two square miles of land split over two parcels that spread along 15 miles of the Arkansas River around Pueblo, Colorado. The central problem presented by this appeal is the District Court's repeated premature resolution of disputed facts against Continental as the nonmoving party at summary judgment. In so doing, the District Court took the role of the jury and asserted itself as the ultimate finder of fact. Among the District Court's various factual findings, three lie at the heart of this appeal. First, the meaning of the ambiguous term of reed, sand, and gravel reserves by appealing to a subset of disputed extrinsic evidence. Second, it determined the materiality of two undisclosed reserve estimates from Western Mobile and Valco created in prior negotiations. And third, it affixed the accrual date for all six of the claims on partial summary judgment. There's not a claim stated for fraud to set aside the contract on the basis of fraud in the inducement or anything involving those kinds of theories, is there? The count one of the second amendment complaint asserts a fraudulent nondisclosure claim. Yes, but in the inducement of the contract or the general state of fraud? It is a concealment or nondisclosure claim that led to the entry into of the contract. But the duty, although it did induce the contract, the duty itself is independent of the contract. Well, one fact the District Court weighed and considered important, and I'm just curious if this is and GSA used it in its calculations. So when you say nondisclosure, that seems to run counter to that fact. So to unpack that question a bit, Your Honor, there were two reserve estimates at issue. One was Western Mobile's reserve estimate of $19.8 million, which I believe is what you're referring to. The second reserve estimate was Valco's own internal response to that $19.8 million, which is approximately $25 million. There is no evidence in the record that the $25 million was at any point in time disclosed to Continental, even to GSA. There is an argument below that as part of the file that was provided from Western Mobile to Continental's expert, that a handwritten notation on one of 19 maps happened to disclose the number $19.8 million total. And at a point in time in this case, Valco has contended that is effectually a disclosure of their $19.8 million reserve estimate. Now, we argue at some length that the adequacy of that disclosure is insufficient because of the context of those maps. It is far less than clear that they knew or should have known that those numbers that are floating on a page were Western Mobile's reserve estimates, partly because it's handwritten notation, partly because there are 19 maps, partly because there are a lot of numbers and not all of them add up to $19.8, nor are all the constituent elements of the $19.8 on its face. There is, on a different page, an indication that those numbers represent tonnage, but again, there is no indication that the disclosure was adequate because the adequacy of the disclosure is itself a factual question. And so, the Court could not have resolved or should not have resolved that issue. The District Court looked at this and said, Continental did its own investigation. It hired its own experts. So, it wouldn't even matter whether or not that was disclosed. Continental was doing its own work. What's wrong with that analysis? Well, at several levels, at one level, the question is, what did Continental retain its experts to do? Our contention, and we believe the evidence supports, and there is, again, evidence submitted by both sides, but the evidence that's submitted by Continental is that Mr. Hyde was retained to calculate resources, an aggregate number that is the first input in a process that would eventually lead to determination of economically minable reserves. He was not retained in the first instance to determine those reserves, and there is some evidence, including his own deposition testimony, that he wouldn't have known how to calculate reserves if he had been asked. The District Court went so far as to say that the meaning of the contract is that the parties basically agreed to hire Ted Hyde and whatever Mr. Hyde said was the number, and we can argue on the face of the contract that that's not what the contract says. But in terms of what he was hired to do, there is at least a disputed issue of fact of whether he was calculating an aggregate number unrelated to whether it was economically minable or, secondarily, that he was unable to calculate a reserve number. Even if he was, even if his due diligence was, as Valco contends that it was, the express representation and warranty provision in the agreement is an obligation that they provide that information, the warranty that they had provided, all material information, without regard to the due diligence. And Section 7.1 of that agreement and Section 8.4 of that agreement make clear that any investigation that Continental would have provided does not abrogate or exclude or modify the representation obligation. Now, there is the question, of course, of materiality itself, of whether those reserve estimates were material. But again, that was a factual question, and there was at least evidence in the record supporting Continental's position that had their board known that the prior reserve estimates were, in fact, 19.8 million and 25 million, they would not have entered into the deal for 50 million agreed sand and gravel reserves. Did they say they wouldn't have entered into the deal just period? Or did they say they would have done additional due diligence or they would have factored it into their own due diligence? I believe the testimony specifically is they would not have entered into the deal at 50 million. I don't believe there's any evidence in the record as to what point exactly they would have entered into the deal. They might have entered into a deal, but it wouldn't have been what they entered. Okay. Correct, Your Honor. But that is certainly enough from our contention under either standard of materiality to meet the material threshold. Materiality, and this again is one of the errors of the district court, it ended up, because of the way the partial summary judgment briefing happened, I believe it was the fifth partial motion for summary judgment, that simultaneously attempted to address nondisclosure and the warranty claim, that the district court ended up merging the two theories and holding that the nondisclosure was immaterial because the reserve estimates were obviated by the due diligence obligations. What was the exact wording of the disclosure requirement for Valco? The disclosure requirement for Valco was that Continental, it had provided Continental all material information in its possession concerning among things, quote, the sand and gravel reserve estimates of the mining properties, and so it says material information in its possession, and possession it goes on to include possession of third parties of the, quote, sand and gravel reserves of the mining properties. And that would seem to clearly take into account this Western estimate. Mobile's estimate. Yeah, Mobile's estimate. As well as its own estimate. As well as its own, right. Are there any cases that you've cited for, that we should know about, in which a due diligence has been conducted by a buyer and proceeds, nevertheless, to seek to assert a claim of this nature based upon some of the information that should have been known or was known to the person conducting the due diligence? There is no exact case on point, Your Honor. There are two cases discussed in the briefing. One is the Ziff-Davis case out of New York, I believe, and then the Colorado Supreme Court case. And we acknowledge that Colorado has not adopted the Ziff-Davis standard. The Ziff-Davis standard is that even if you discover in due diligence the falsity of the rep and warranty, you can still proceed on it, because the indemnification obligation is essentially a strict liability obligation. The Colorado Supreme Court has disagreed to an extent with that standard, but only to the extent that the party actually knows. And here the argument, the entire argument, is whether the party knew. There is no evidence to support that it knew about the $25 million internal Valco reserve estimate. There was a disputed question of fact as to whether the $19.8 million handwritten reserve note was sufficient to provide notice of that particular element. And, again, to be precise here, the claim and some of this is what the district court focused on. Well, this case is complicated because of the fact that you have two experts putting two different numbers on the reserve. And only when the company went into actual operation was it determined which of those two numbers had the more validity. Am I right about that, or does the record not support that view? It's more complex than that. Even more complex? Even more complex, Your Honor. So it is true that there are various numbers that the parties were calculating, and the Valco continental materials come from a prior negotiation. But even within the transaction between Continental and Valco, there's a fundamental disagreement as to what it was Mr. Ide was attempting to calculate, and then secondarily, what the parties were agreeing to in the contract when they were setting royalties, both minimum royalties and production royalties, on this undefined term of green sand and gravel reserves. It's a capitalized term. It's clearly important to the meaning of the contract, but the parties otherwise do not define it. And our argument is both because of the silence and its centrality to the contract is ambiguous, but also because the two theories espoused or two interpretations espoused by both parties can equally work throughout that provision. Now, we happen to think that our reading is the more credible reading, because parties would not enter into a 100-year lease to pay a fixed minimum royalty if there's nothing in the ground other than sand. But nevertheless, allowing for the possibility that one can read minimum royalties as the obligation is abstracted from actual production, then you have a production royalty key that points in the direction of actual production, and you have a minimum royalty under Valco's theory that supports an absolute obligation based on just an aggregate number on the ground, and the district court should have stopped there on summary judgment. And if it didn't stop there and look to the extrinsic evidence under a lazy dog theory, for example, it should have stopped that determination when it realized that the extrinsic evidence was pointing in multiple directions. We provide ample citations that Continental clearly understood, even in some of the board presentations that the district court was relying on, that it was entering into an agreement based on material that was mineable, that would be extracted, that would be sold or used. And we acknowledge that some of the language is less than clear, but again, because the evidence points in multiple directions, it's a question of fact that should have been resolved. Running low on time, and I want to talk about statute of limitations, because the east side of the river, the 1300, is the disputed portion, where supposedly not economically available supply or reserve to meet the royalty obligation, but certainly Continental had been trying for years and years to make that work, and far beyond a statute of limitation period from when it started. Why do you not lose on statute of limitations? So the statute of limitations begins to run when the claim accrues, and the accrual determination is ordinarily a question of fact, which again is improper as a category at summary judgment unless the facts are undisputed. Again, part of the error here is that the district court decided that the accrual was determined based on the fact of near shortfall. But the accrual rule is more than that. It's more than just the discovery of the injury. It's the discovery of when you have elements of the claim, which includes in some articulations from this court the wrongful conduct of the party at issue. And here the wrongful conduct in cases of the failure to disclose the warranty claim was the discovery that there was in fact a secondary reserve estimate, which was unknown to Continental until the discovery in this case. Even earlier than that, but not by much, was the discovery of the difference of opinion interpretation of the meaning of the term agreed standard gravel reserves, which was not known to Continental until this case. What Continental filed this case on was the near shortfall, and at that time it argued mutual mistake, and it wasn't aware of that given the complexity and size of the property until approximately a year before it filed suit. And we cited to a document below where we recognize that it displays our knowledge there. Well, you recognized as early as, wasn't it about 2002 when you realized there was some real problems with the East, Pueblo East? Why didn't you have some obligation to move quicker in terms of, even if it was just to make your mutual mistake argument, to do some kind of due diligence to say, well, there's a problem here? Well, in terms of the mutual mistake argument, it was because we believed that over time, on a hundred-year lease on 1,400 acres, that eventually the ratio would earn out where that there was appropriate material. The party moved as quickly as they could. They consulted with Valco and possible ways to do so, but in any event, the record below to the district court doesn't establish a clear, undisputed moment when they knew that the shortfall was going to persist across the entire property. Thank you. Good morning. My name is Kenneth Siegel. May it please the Court. Judge Moritz, I'd like to respond to your question about the statute of limitations before I address the general thrust of my arguments. What the record shows, and the reason that Judge Meech entered summary judgment for multiple reasons, including on statute of limitations, is he said the record is clear, and he cited the testimony of both Mr. Summ and Mr. Gitwitz, that they knew in 2002, and what happened is they had another sand and gravel site in Colorado Springs that was shut down because of a landslide. So they wanted to keep the Pueblo site, knowing full well that according to their view, they couldn't economically mine it. So there's no question of fact that would normally exist on statute of limitations. What they did is they simply sat and waited. The appeal in our judgment is fraught with a number of problems, both legal... Go back to the sat and waited, because I think there sounds like there's a question of fact about whether what they did was sat and waited. They continued to mine. They continued to try to pay you the royalties. They continued... No, because... I don't understand what you mean by sat and waited when they don't know until they file this lawsuit what sort of the smoking gun to them is, which is the information they never got back when they entered into the contract that they say is material. They don't know that until they file this lawsuit on other grounds of mutual mistake. I guess I'm struggling with what should have clued them in... Well, let me go to... ...other than you guys handing them what you didn't give them... Okay. ...way back when. What we gave them is everything we had on Western Mobile. Now let's delve into the Western Mobile and also look at what... ...the number, which is what they really needed. Actually, we did. We gave them the information that was the basis of the calculation. You mean the notation of the number? No, no, no. If you would look at our brief, we copied a chart that their expert, Ted Eye, did, where he calculated using the Western Mobile data that there was over 48 million tons of property on the entire property on the east side. That's one of the fallacies in the argument. Continental has stipulated that the GSA calculation is correct. They have also stipulated that the methodology is correct. What Mr. Eye did is he calculated using Western Mobile, and he said the Western Mobile number is 48 million. It's on page 10 of our brief. And so what you find is they had the information as to what Western Mobile's calculation was for the entire property. Well, getting back to what you were required to disclose, just put it aside. I understand your argument about, well, they did their own due diligence, and we gave them such and such information. What were you initially required to disclose? Material reserve information concerning the property. And is there a definition of reserve, or what would be reserve information? He says it's anything you have from third parties that would pertain to. . . I can tell you that reserve is stated in the contract as the calculation by GSA. Again, in section 4.2 of the acquisition agreement. . . Yeah, I understand that. Okay, so the term reserve is defined as what's calculated by GSA. We gave them everything we had on Western Mobile. Did you give them everything you had from third parties that would pertain to the quantity of reserves? Absolutely everything. Except the amount. No, no, no. We even gave them the 19 million. It's on a map that is a Western Mobile. So you're talking about the notation now? Yes. Assuming we don't agree that you gave them that, because it was on a notation on a page that wasn't identified as anything in particular, assuming we don't agree, how did you give them that really important number, which was a quantity which was much lower than any other calculation had come up with? What we gave them was . . . The result of the calculation? Sure. What we gave them is what was required by the contract. And the contract wasn't give us a calculation of what is on one particular parcel. And a point I want to explain is the 19 million and the 25 million is not a reserve calculation for the entire property. It's only for certain portions of the property. And the 50 million ton that was agreed to is based upon the entire property. So what we gave them is all of the data that Western Mobile used that was then the basis of the calculation of the 48 million. We also gave them the map. We gave them what we had from a third party. Everything that Western Mobile had, we gave them. And when Judge Mates said, that there is nothing material with respect to either a failure to disclose or information pertaining to the warranty, his analysis was this. Number one, GSA calculated using Western Mobile that for the entire property, it's 48 million tons. Number two, they've stipulated that it was a correct calculation. Number three, they didn't challenge that stipulation. And I'd like to address this as part of the way. Fairness, they said they didn't challenge because they didn't know material information regarding segments of the whole. No. When I say they didn't challenge it, what I mean is Judge Mates made a decision. No, I understand. He said, look, as I understand what Judge Mates said, is that the information that is alleged not to have been disclosed, it was not material anyway. Yes. Now, of course, you're... They're arguing material. Colleagues on the other side say, yes, it was material. Not only material, but very important. Right. Because it would have led us to information that could have discovered that the aggregation of the whole was not correct either. And what say you to the issue of materiality? We say the issue isn't material because based on the stipulation, they stipulated that the GSA calculations were correct. GSA made a calculation as to what Western Mobile concluded. If you look on page 10 of our brief, you actually have a screenshot of the Western Mobile calculation made by GSA. And they didn't challenge that finding. Then what happened, and this goes to the issue of waiver of claims. One of the reasons why the summary judgment ought to be affirmed is that one of them is Judge Maitch's finding that based upon the stipulation, the information from Western Mobile was not material. They didn't raise the stipulation at all in the opening brief. And so let me talk for a minute as to how that applies on the doctrine of waiver. This court has applied in a number of situations the argument that if summary judgment is granted on multiple grounds, which it was for all six of the claims, and then the appellant doesn't challenge each of those independent grounds, there's a waiver that must result in an affirmance of the decision. That's exactly what's happened in this case. If you look first at what the remedies and relief are that is requested in each of the claims, it's the same for each of the claims. And so what Continental has done is they've said we want to prospectively rescind, we want to reform, and we want damages as to the difference between the production royalty and the minimum royalty. And Judge Maitch, in his summary judgment, at pages 17 through 19, rejected each one of those damage or remedies requests. There is absolutely no challenge, no comment either in the opening brief or in the reply brief or in Mr. Sink's argument about the fact that Judge Maitch has said for all six of your claims, you lose with respect to the remedies and damages. And there's never been a challenge to that. Now, when you look at each of the six claims, the same thing is true. He said with respect to the fraud claim, the first claim, there's no duty. They didn't challenge what is a legal issue in the opening brief. With respect to the second claim, breach of warranty, it's based upon the stipulation and the $48 million figure that I've given you on page 10. No comment. They didn't even include the stipulation in the opening brief. We included it as our supplemental record and they come back and they say... Isn't there argument that they wouldn't have entered into the stipulation if they'd have had the complete reserve estimate? No, no, no. No, the stipulation was entered into during discovery, approved by the... Oh, you mean, okay, yeah, I see. Okay. Yeah. And so the... And they don't challenge that on appeal. They lost on the second claim based upon the stipulation. They make no mention of the stipulation in the opening brief and they claim it's irrelevant in the reply brief disregarding the fact that on page 10 you have GSA's calculation. When you say $48 million, are you talking about economically mineable and does that matter? Well, if you look, for example, and let me give you the specifics. If you look at the contract, the word reserve is used in the lease to mean the amount that was calculated by GSA. We have two specific references that are, again, included in our brief and never discussed by Continental's counsel. In the section 4.2 of the acquisition agreement, they refer to the reserve as calculated by TEDI. What Judge Maitz said is, had they meant economically mineable, they would have used the term economically mineable. The only occasions... But isn't that implicit? Pardon? Isn't that implicit? No, no. To the contrary. Why not? Explain to me why. Well, because their expert, TEDI, said no, the term reserve means a volume calculation. And he said, I was asked by Continental to calculate the term reserve. And I calculated the reserve. And so, no, it is an effort to create an issue of fact when none exists. Why isn't there an issue of fact based on your own, the offer and counteroffer that use those terms? Why would we just ignore those when both parties use those terms? That specific term. Okay. Judge Maitz noted they didn't use it again. When they wanted economically mineable, they used the term. Then when you look in the letter of intent, Judge Maitz says they didn't use economically mineable in that. But if you look at paragraph... It's odd that they would use it in the offer and then not intend. And you would use it in your counteroffer and then nobody intend for that to continue on. Well, actually, the explanation to that is if you look at the offer, it says economically mineable as agreed to by the parties, then the parties reached an agreement. And that's where the 50 million tons comes from. So as agreed to by the parties, then, would seem to indicate they agreed to an economically mineable... They agreed to 50 million. And it's illustrated by the fact that 10 years after the lease, Joe Sum said, I based the 50 million on GSA's calculation with a 10% cushion. The other point I'd mention to sum up is that in arguing there are issues of fact, what Continental has again failed to do is address important issues in the lease. Just a four corners analysis that provides no explanation. As an example, Judge Moritz, your question suggests, well, did they mean economically mineable? In paragraph 2D, they have to pay the minimum royalty regardless of whether they mine the property. Now, that's a clear indication that they knew they may not be able to economically mine it. Clear language. The same thing is true in paragraph 5, where the obligation to pay either the production royalty or the minimum royalty. Well, they thought there was that much there. They thought they could mine that much. Can you tell me on the 19.8, you earlier said that that was a number that was drawn from only a limited portion. Where do we find that and what limited portion? We include in our brief a copy of the notes that are on the Western mobile map and it identifies the specific parcels that total that 19.8 million and clearly indicates that. Was that information provided? Yes. Not only was it provided, it was reviewed by Ted Eide and what Mr. Eide said is I didn't ask any questions about it because Continental wanted me to do an independent analysis. I'd like to make just two other points. I'm sorry. We'd like to hear them. Your time is up, Counsel. Your time is also up as well. I recognize that both counsel would have made further arguments and we appreciate that. We have to unfortunately rely on your briefs.